**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**


AMALGAMATED BANK, As         :
Trustee For THE LONGVIEW      :
COLLECTIVE INVESTMENT        :
FUND, DEKA                    :
INTERNATIONAL (IRELAND)      :
LIMITED, and DEKA            :
INTERNATIONAL S.A.           :
LUXEMBOURG, and ALLAN        :
SELBST, On Behalf of         :
Themselves and All Others    :     CIVIL ACTION NO.
Similarly Situated,          :     1:05-CV-1226-RWS
                             :
          Plaintiffs,        :
                             :
     v.                      :
                             :
THE COCA-COLA COMPANY,       :
DOUGLAS N. DAFT, STEVEN J.   :
HEYER, E. NEVILLE ISDELL,    :
and GARY P. FAYARD,          :
                             :
          Defendants.        :

## ORDER

Before the Court is Defendants' Motion to Dismiss [55].  After reviewing

the record, the Court enters the following Order.

## Background

This is a consolidated securities fraud class action.  Plaintiffs seek to

represent a class of individuals who purchased or otherwise acquired Coca-Cola Company securities between January 30, 2003 and September 15, 2004 (the "Class Period").  The facts relied upon in this Order derive from Plaintiffs' Consolidated Class Action Complaint [41] (the "Complaint") and other undisputed documents properly before the Court.

## I.    The Parties

Plaintiffs Amalgamated Bank, Deka Funds, and Allan Selbst purchased shares of Coca-Cola Company common stock during the Class Period. Defendant The Coca-Cola Company ("CCC" or "Coke") is a publicly traded company which manufactures and sells non-alcoholic beverage concentrates and syrups worldwide.  Defendant Douglas N. Daft served as Chief Executive Officer and Chairman of CCC from February 2000 to May 2004.  Defendant Steven J. Heyer served as President and Chief Operating Officer of CCC prior to the beginning of the Class Period until May 2004.  Defendant Gary P. Fayard served as Chief Financial Officer of CCC throughout the Class Period. Defendant E. Neville Isdell became Chairman and Chief Executive Officer of CCC in May 2004.

2

## II.   The Class Allegations

Plaintiffs allege that they and other similarly situated individuals suffered damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Federal Regulations. See 15 U.S.C. §§ 78j(b), 78t(a), 17 C.F.R. § 240.10b-5.  In support of their claims, Plaintiffs allege that Defendants engaged in a series of fraudulent misrepresentations throughout the Class Period that artificially inflated the value of CCC stock.

Plaintiffs' Complaint is a 137-page narrative of CCC's operations and public statements dating back to three years prior to the Class Period.[1]  The Complaint focuses on CCC's allegedly failed business strategies, explaining in varying detail, for example, CCC's introduction of its C2 product line, CCC's marketing program in 2003-04, and its response to changes in the German market in early-2003.  Between its disquisition on CCC's failures, the Complaint intersperses quotations of public statements by CCC officers, analyst

---

[1] Plaintiffs repeatedly use bold and italicized fonts in the Complaint in an apparent attempt to emphasize certain words and phrases.  Plaintiffs also repeatedly end sentences with exclamation points.   For ease of reference, the Court omits Plaintiffs' aforementioned stylization when quoting the Complaint.

commentary, and newspaper reports bearing on the performance of CCC.

Plaintiffs claim that, among these diverse sources, they have alleged with

particularity Defendants' violations of the securities laws.

In their brief, Plaintiffs summarize their allegations as five-fold.[2]  First,

Plaintiffs allege that Defendants misrepresented CCC's fundamental operating

systems and financial health by "creating the false appearance of a successful

turnaround" and announcing 11% EPS growth. (See Pls.' Br. in Opp. to Defs.'

Mot. to Dismiss [61] [hereinafter "Opp."] at 5-9; Compl. ¶¶ 3-11.)  Second,

Plaintiffs allege that Defendants misrepresented "the status of Coke's marketing

programs under the new business plan," by representing CCC had "excellent

marketing" when in fact its marketing program was "in shambles." (Opp. at 10-

12; Compl. ¶¶ 12, 73-79.)  Third, Plaintiffs allege that Defendants

"misrepresented the adverse conditions surrounding Coke's German

---

[2] Plaintiffs' discussion in their briefs guides the Court's analysis.  The Court need not further parse Plaintiffs' Complaint for allegations not asserted and defended as such. See Ehlert v. Singer, 245 F.3d 1313, 1316 n.2 (11th Cir. 2001) (limiting analysis, in securities fraud case, to alleged misrepresentations defended in plaintiffs' briefs, and finding that any "[o]ther allegations in the amended complaint were abandoned either explicitly . . . or implicitly by Plaintiffs' failure to present the allegations to the district court as a basis for liability"); see also Next Century Communications Corp. v. Ellis, 318 F.3d 1023, 1027 & n.2 (11th Cir. 2003) (addressing one alleged misstatement after noting that "[i]n its brief, appellant points to . . . only one specific statement made by Ellis").

AO 72A
(Rev.8/82)

operations," by publicly stating that it "had the necessary infrastructure, initiatives, and new packaging" in Germany when it was in fact "effectively shut out of distributing its products in the key German discount channel." (Opp. at 12-16; Compl. ¶¶ 54-59; 124-29.)  Fourth, Plaintiffs allege that Defendants "misrepresented the current status of Coke's bottler relationships" by stating it was "very well aligned" with its bottlers, when "[i]n truth, Defendants had not succeeded in aligning Coke's interests with its bottlers." (Opp. at 16-19; Compl. ¶¶ 55-57, 71, 78.)  Finally, Plaintiffs allege that Defendants misstated CCC's financial results by failing to write down the value of its German bottling assets in 2003, at a time when Germany had introduced new restrictions on the distribution of aluminum cans that adversely affected the value of its German assets. (See Opp. at 16-17; Compl. ¶¶ 125-34.)  After discussing the legal standard applicable to a motion to dismiss, the Court turns to address each of Plaintiffs' allegations.

## Discussion

### I.    Motion to Dismiss Standard

When considering a FED. R. CIV. P. 12(b)(6) motion to dismiss, a federal court is to accept as true "all facts set forth in the plaintiff's complaint."

Grossman v. Nationsbank, N.A., 225 F.3d 1228, 1231 (11th Cir. 2000) (citation

omitted).  Further, the court must draw all reasonable inferences in the light

most favorable to the plaintiff.  Bryant v. Avado Brands, Inc., 187 F.3d 1271,

1273 n.1 (11th Cir.1999).  Thus, a complaint may not be dismissed under Rule

12(b)(6) "'unless it appears beyond doubt that the plaintiff can prove no set of

facts in support of his claim which would entitle him to relief.'" Rosen v. TRW,

Inc., 979 F.2d 191, 194 (11th Cir.1992) (quoting Conley v. Gibson, 355 U.S.

41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

       While a court normally limits the scope of its review to the plaintiff's

complaint, a document that is central to the case and not in dispute is properly

considered in resolving a motion to dismiss.  Ehlert v. Singer, 245 F.3d 1313

(11th Cir. 2001).  Documents attached to a plaintiff's complaint are normally

properly considered, as are "document[s] central to the complaint that the

defense appends to its motion to dismiss . . . provided its contents are not in

dispute." Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999).

Furthermore, in securities fraud cases, courts may consider "any cautionary

statement accompanying [a] forward-looking statement, which are [sic] not

subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e);

Harris, 182 F.3d at 802 n.2; see also Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276 (11th Cir. 1999) (approving of the Second Circuit's practice of judicially noticing relevant documents legally required by and publicly filed with the SEC at the motion to dismiss stage).

## II.   General Requirements to State a Claim for Securities Fraud under Federal Law

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  Rule 10b-5, promulgated by the Securities & Exchange Commission, states:

> It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>> (a) To employ any device, scheme or artifice to defraud,
>> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To succeed on a Rule 10b-5 fraud claim, a plaintiff must establish (1) a false statement or omission of material fact, (2) made with scienter, (3) upon which the plaintiff justifiably relied, (4) that proximately caused the plaintiff's injury. Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447 (11th Cir. 1997). Section 20(a) of the Exchange Act extends liability for a corporation's violations of Rule 10b-5 to the "controlling persons" of such corporation. 15 U.S.C. § 78t(a).

Defendants attack Plaintiffs' allegations on three grounds.  First, Defendants argue that the statements underlying Plaintiffs' allegations are not actionable false statements of material fact because they constitute corporate optimism, or alternatively, are "forward-looking statements" protected under the safe harbor provisions of the Private Securities Litigation Reform Act. Second, Defendants argue that Plaintiffs have not sufficiently alleged scienter with particularity.  And finally, Defendants argue that Plaintiffs have failed to allege a causal relationship between any alleged misrepresentations of fact and Plaintiffs' loss.

### III.  Materiality of Alleged Fraudulent Statements

### A.      Legal Standards

1.      Puffery

The first prong of the fraud inquiry requires that an alleged representation

be premised on a material fact.  That is, the alleged fraud must be based upon a

statement capable of "empirical verification" and not a statement of "opinion or

expectation." Next Century Commc'ns Corp. v. Ellis, 318 F.3d 1023, 1028

(11th Cir. 2003).  Subjective characterizations of a company's current

performance or predictions about future performance, absent a false

misstatement of fact, are generally not actionable.  Thus, statements that a

company's growth is currently or is expected to be "strong," id. at 1027-28, or

that a company is "recession-resistant," Searls v. Glasser, 64 F.3d 1061, 1066-

67 (7th Cir. 1995), or that a company expects a "10% to 30% growth rate over

the next several years" and is "poised to carry the growth and success . . . well

into the future," Raab v. Gen. Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993), or

that a company has "the combination of people and products in place to be

successful" and is "now positioned to effectively compete," In re Software

Publ'g Sec. Litig., 1994 WL 261365 at *4-7 (N.D. Cal. Feb. 2, 1994), are

insufficient as a matter of law to state a valid securities fraud claim.

Courts have reasoned that such statements of "corporate optimism" or

"puffery," in addition to lacking a underlying factual basis, also fail the

materiality requirement of Rule 10b-5.  The Tenth Circuit, in its oft-cited

decision in Grossman v. Novell, Inc., 120 F.2d 1112, 1119-20 (10th Cir. 1997),

reasoned that "[v]ague, optimistic statements are not actionable because

reasonable investors do not rely on them in making investment decisions." Id.;

see also In re S1 Corp. Sec. Litig., 173 F.Supp.2d 1334, 1352-56 (N.D. Ga.

2001) (applying Grossman to hold that alleged misrepresentations, including

company statements that it "took several bold steps to solidify this market" and

had achieved "growth milestones," constituted "vague puffing and immaterial

corporate optimism").  Stated differently, self-congratulatory characterizations

of corporate performance do not "alter the total mix of facts available to an

investor," and are not be substantially likely to be considered important by a

reasonable investor in making investment decisions.  See Basic, Inc. v.

Levinson, 485 U.S. 224, 246-47, 108 S. Ct. 978, 99 L. Ed.2d 194 (1988).  Thus,

even where a statement is intentionally misleading as to the speaker's true

opinion or prediction, it may be held immaterial as a matter of law because no reasonable investor would rely upon it.

"Statements that do more than offer rosy predictions," however, "when a defendant knows that the statements are false, can be the basis of a securities fraud action." In re Scientific-Atlanta, Inc. Sec. Litig., 239 F. Supp.2d 1351, 1360 (N.D. Ga. 2002); Va. Bankshares v. Sandberg, 501 U.S. 1083, 1094-95, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991) (concluding that director's statement in proxy solicitation that tender price of the company's stock of $42 a share was "high" and "fair" to minority shareholders was material statement in the context where stock valuation was subject to objective methods of valuation and directors' opinions were shown to be false).

### 2.    Forward-Looking Statements

Even statements that go beyond "corporate optimism" may be held non-actionable if they are "forward-looking" and accompanied by meaningful cautionary language. The Private Securities Litigation Reform Act of 1995, Pub.L. 104-67, 109 Stat. 737 (1995) (hereinafter "PSLRA"), which amended the Securities Exchange Act of 1934, provides a safe harbor for "forward-looking" statements that are "accompanied by meaningful cautionary statements

11

identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(I).

Statements defined as "forward-looking" include "projection[s] of revenues, income . . ., earnings . . ., or other financial items," 15 U.S.C. § 77z-2(I)(A); "statement[s] of the plans and objectives of management for future operations," id. § 77z-2(I)(B); "statement[s] of future economic performance," id. § 77z-2(I)(C); or "statement[s] of the assumptions underlying or relating to" the above. Id. § 77z-2(I)(D).[3]  In Harris, for example, the Eleventh Circuit held

---

[3] The PSLRA defines a "forward-looking statement" as follows:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

12

that, considered in context, a company's statements that its "[r]eorders are expected to improve," or its "fundamental business and its underlying strategies remain intact," or that it is "well positioned," were forward-looking and, because they were accompanied by meaningful cautionary language, were immunized from liability under the PSLRA.  Harris, 182 F.3d at 799.

To be "meaningful," a cautionary statement accompanying a forward-looking statement must identify "important factors" that might adversely affect the results discussed in the forward-looking statement. 15 U.S.C. § 78u-5(c)(1)(A)(I).  But it need not include all factors. Harris, 182 F.3d at 807.  "In short, when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." Id.

Once a court determines that a statement is protected under the safe harbor, "the defendants state of mind is irrelevant." Id. at 803; see also H.R. Conf. Rep. 104-369, at 44 (1995) reprinted in 1995 U.S.C.C.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the

---

15 U.S.C. § 77z-2(I).

cautionary statement accompanying the forward-looking statement.  Courts

should not examine the state of mind of the person making the statement.").  A

finding that a statement is protected under the safe harbor is therefore

conclusive.

With these standards as a foundation, the Court turns to address whether

Plaintiffs' allegations of misrepresentations constitute non-actionable puffery or

are protected under the PSLRA safe harbor.

### B.    Plaintiffs' Specific Allegations

1.    <u>Statements Regarding CCC's Fundamental Operating Systems and Financial Health</u>

In their first allegation, Plaintiffs allege that Defendants misrepresented

to investors that CCC "had successfully returned Coke to rapid and sustainable

EPS growth." (<u>See</u> Opp. at 5.)  Plaintiffs point to statements made by

Defendants Daft, Heyer, and Fayard at the beginning of the Class Period.

Labeling these statements as pertaining to "Coke's New Business

Strategy/Model," Plaintiffs cite Defendants as falsely claiming that CCC had

"the right leadership," CCC had restored its marketing system to "health," and

CCC was "confident [it] would meet its 11%-12% annual EPS growth target"

which was "realistic and achievable" in the "very bright future" ahead.  (See

Compl. ¶¶ 6-10.)  The tenor of these statements continued into the middle of the

Class Period, when CCC reported its year-end earnings on February 11, 2004,

and concurrently stated that "[CCC's] strategy is being well-executed," and that

its earnings reflected CCC's "flawless execution" of its "crystal clear strategy."

(See Compl. ¶ 76.)  As a result of these "extremely positive statements and

Coke's reported record financial results," Plaintiffs allege, "Coke's executives

pushed Coke's stock back up to over $50 per share" in early 2003.  (Id. ¶ 13.)

In late-2003, however, Defendant Isdell replaced Defendant Daft as

Chairman and CEO of CCC, and offered a different assessment.  On one

occasion, he stated that "some managers lack the skills to execute the

company's fledgling effort to achieve more-profitable volume growth," and

"today we're not growing the way we should be." (Id. ¶ 116.)  Plaintiffs allege

that Defendant Isdell's admissions revealed the fraud which underlay the other

Defendants' previous assessments.  Plaintiffs conclude:

> Ultimately, at the end of the Class Period, Defendants' "house of
> cards" came crashing down, when it was revealed that Coke did
> not have a winning business strategy and Defendants had not
> orchestrated a successful business turnaround.  Instead, investors
> learned that contrary to Defendants' false representations, Coke

> was plagued with fundamental and highly negative business
> conditions that had never been corrected . . . .

(Compl. ¶ 7.)

There can be little doubt that these alleged misrepresentations constitute statements of "opinion or expectation" that courts have uniformly held not actionable.  See Next Century Comms., 318 F.3d at 1028.  CCC's self-serving and unabashedly optimistic characterizations of its work force, its strategy, its health, and its execution are no less the "rosy affirmation[s] commonly heard from corporate managers and numbingly familiar to the marketplace" than the statements that were readily dismissed in Serls, Raab, Grossman, and other cases examining the doctrine of immaterial puffery. Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996); see also In re Splash Tech. Holdings, Inc. Secs. Litig., 160 F.Supp.2d 1059, 1077 (N.D. Cal. 2001) ("[S]tatements which used the words 'healthy,' 'strong,' or 'increased awareness' constitute[ ] vague assessments of past results, on which no reasonable investor would rely."); In re ATI Techs., Inc. Secs. Litig., 216 F.Supp.2d 418, 433 (E.D. Pa. 2002) ("ATI's spin on its historical performance, as setting a 'record in

revenue,' conferring a 'strong start,' and giving ATI 'market leadership,' is puffery.").

Notably, although Plaintiffs generously quote statements that were made in connection with CCC's 2003 SEC disclosures, Plaintiffs do not allege that CCC's financial statements themselves contain fraudulent misrepresentations.[4] Besides offering the post-Class Period critique of CCC's newly hired CEO, which take issue with the glowing assessments of his predecessors, Plaintiffs have not demonstrated how such statements are capable of empirical verification, much less how a reasonable investor would rely upon such statements in making an investment decision. See Basic, Inc.., 485 U.S. at 246-47.

The Court also concludes that the Defendants' statements, including most notably, their predictions of 11%-12% EPS growth, are forward-looking statements protected by the PSLRA safe harbor. Defendants made the alleged

---

[4] Plaintiffs, in defending the "health and operating systems" aspect of their allegations, group together other allegations contained in their Complaint. In addition to citing the statements of its executives characterizing CCC's performance, for example, Plaintiffs allege that the 11% EPS growth figures contained in CCC's 2003 financial disclosures were fraudulently inflated due to CCC's failure to timely write down its good will in its German assets. (See Opp. at 22; Compl. ¶¶ 112-34.) The Court addresses these allegations below.

statements on February 12, 2003 and February 11, 2004, during conference calls between Defendants Daft, Fayard, and analysts. (Compl. ¶ 51.)  At the beginning of each conference call, Defendant Daft stated: "I'd like to remind everybody that this conference call [] contain[s] forward-looking statements including statements concerning our long-term earnings objectives and should be considered in conjunction with the cautionary statements that are contained in our earnings release and exhibit 99.1 of the company's most recent form 10-K." (See Ex. 3 & Ex. 18 to Defs.' Br. in Supp. of Mot. to Dismiss [57-4].) Exhibit 99.1 of CCC's 2001form 10-K contains an extensive cautionary statement which includes a list of 11 general factors to be considered alongside statements by CCC of expectation or prediction. (See Ex. 1 to Defs. Br. in Supp. of Mot. to Dismiss [57-2].)  Included among these factors are "our ability to achieve earnings forecasts," "changes in consumer preferences," "changes in laws and regulations . . . and environmental laws in domestic or foreign jurisdictions," the "effectiveness of our advertising programs," and "the ability to maintain favorable supplier arrangements and relationships." (Id.)

Plaintiffs have made no attempt to distinguish the risks disclosed in CCC's cautionary statements from the risks that were actually realized, much

less demonstrate that they were not "sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." <u>Harris</u>, 182 F.3d at 807.  Instead, Plaintiffs cite other allegations in their Complaint, and argue that, in any event, the statements described above were not forward-looking but instead concerned CCC's "current business conditions." (Opp. at 22.)  Plaintiffs' argument, however, relies on the same logic that was rejected by the Eleventh Circuit in <u>Harris</u>.  In concluding that a statement that the defendants' "fundamental business and its underlying strategies remain intact" was forward-looking, the Eleventh Circuit explained:

> While it is true that the *state* of Ivax's "fundamental business" and "underlying strategies" is a question of present condition, whether they are intact is a fact only verifiable by seeing how they hold up in the future.  Likewise, whether Ivax is "well positioned" is a statement whose truth can only be known after seeing how Ivax's future plays out.  That puts this statement in the safe harbor, as well.

<u>Id.</u> at 805 (emphasis in original).

The Court fails to perceive any meaningful distinction between the statements in <u>Harris</u> and the statements alleged here.  Whether CCC's strategy is "being well-executed" or whether CCC has a "crystal clear strategy" are facts

only verifiable – if verifiable at all – in the future.  Moreover, Defendants'

earnings estimates fall squarely within the protection afforded by the PSLRA to

"projection[s] of revenues, income . . ., earnings . . ., or other financial items"

that are accompanied by meaningful cautionary language. 15 U.S.C. § 77z-

2(I)(A).

Having reviewed the materials submitted by the parties, the Court

concludes that Defendants' cautionary statements are "meaningful" under the

PSLRA.  Plaintiffs have failed to demonstrate how the numerous risks

identified by Defendants are dissimilar from those which eventually came to

fruition.   Accordingly, Defendants' forward-looking statements are protected

by the PSLRA safe harbor.  Because Plaintiffs have failed to direct the Court's

attention to any actionable false statement of material fact, and because

Defendants' statements are protected from liability under the PSLRA, the Court

concludes that, insofar as Plaintiffs' allegations rest on CCC's optimistic and

forward-looking evaluation of its strategy and operating systems, Plaintiffs'

claims fail as a matter of law.

2.   <u>Statements Regarding CCC's Marketing Systems</u>

In their second allegation, Plaintiffs allege that Defendants misrepresented that CCC "had achieved accelerated growth in earnings as a result of reasserted marketing innovations and by restoring Coke's marketing system to health." (Opp. at 10.)  Plaintiffs point to a variety of statements made by Defendants during the Class Period which characterized CCC's marketing as highly effective.  For example, in February 2003, Defendant Fayard stated that CCC had "reasserted marketing innovation and excellence worldwide." (Opp. at 10; Compl. ¶ 51.)  At later times in the Class Period, Defendants stated that CCC's "marketing system ha[d] been restored to health (Compl. ¶ 73); that there were "solid improvements" in marketing (Compl. ¶ 75); and that CCC "had marketing at a much higher level in the first quarter" of 2003 than it had in the past (Compl. ¶ 79).  These statements, Plaintiffs allege, constitute material falsehoods.  They conclude:

> Contrary to Defendants' public representations, at no time during the Class Period did Coke have "excellent marketing," "solid improvements in marketing," or a marketing system that had "been restored to health". . . . The lack of proper of proper marketing was highly material information, because Coke needed adequate investment in marketing in order to achieve a business turnaround and sustainable earnings growth.

(Opp. at 10-11.)

For the same reasons discussed above, the Court concludes that

Defendants' statements, which characterize their marketing programs in a

positive manner, constitute non-actionable puffery.  As such statements are not

capable of empirical verification, they cannot be the basis for securities fraud.

See In re S1 Corp. Securities Litig., 173 F.Supp.2d at 1352-56.  Plaintiffs'

allegations, in effect, complain that CCC officials labeled their marketing

programs in 2003 as "growing," "improving," and "healthy," instead of as "in

shambles" or "failing."  Plaintiffs' allegations "call[] for pejorative

characterizations of disclosed factual matters," and, as such, fail as a matter of

law.  Kowal v. MCI Comms. Corp., 16 F.3d 1271, 1277 (D.C. Cir. 1994)

(Sentelle, J.)  ("Since the use of a particular pejorative adjective will not alter

the total mix of information available to the investing public, such statements . .

. cannot serve as the basis of a 10b-5 action under any theory.").

Furthermore, the Court concludes that the statements alleged are

protected by the PSLRA safe harbor.  First, a statement bearing on the

effectiveness of CCC's marketing programs is dependent upon how CCC's

"future plays out," and is therefore forward-looking.  Harris, 182 F.3d at 805.

22

Second, there is no dispute that each statement alleged by Plaintiffs was accompanied by the same cautionary language discussed above.  Defendant included in its description of factors bearing on the risk of investment in CCC "[t]he effectiveness of our advertising, marketing and promotional programs." (See Ex. 1 to Defs. Br. in Supp. of Mot. to Dismiss [57-2].)   There can be no doubt that this is sufficiently similar to the risk about which Plaintiffs complain in their second allegation.   Accordingly, having reviewed the cautionary statements accompanying Plaintiffs' alleged misrepresentations, the Court concludes that they are "meaningful" within the PSLRA.

Notably, Plaintiffs do not allege that Defendants misrepresented their expenditures on marketing, nor do they allege that Defendants misstated any facts underlying their past or ongoing marketing programs.[5]  Their claims rest entirely on Defendants' subjective characterizations of the effectiveness of their marketing programs.  Because the Plaintiffs have failed to direct the Court to

---

[5] Plaintiffs have alluded to an allegation that CCC cut marketing expenses in 2003 to boost profits.  (See Opp. at 11-12.)   However, according to Defendants' SEC disclosures, CCC increased its marketing expenditures by $100 million in 2003 from fiscal 2002.  (See Ex. 27 to Defs.' Mem. in Supp. of Mot. to Dismiss at 57.) Significantly, Plaintiffs have not alleged that CCC's marketing expenditures were fraudulently reported.

23

any statements that could even arguably be construed as material

misrepresentations under the securities laws, Plaintiffs' claims fail insofar as

they relate to Defendants' self-congratulatory characterizations of their own

marketing programs.[6]

       3.    Statements Regarding CCC's Conditions Surrounding
              CCC's German Operations

In their third allegation, Plaintiffs cite a number of Defendants'

statements that they allege misstated CCC's ability to respond to changes in

Germany's beverage market.  In January 2003, Germany enacted a mandatory

deposit law, which Plaintiffs allege "adversely impacted the sale of carbonated

soft drinks in cans, leading consumers to shift to returnable packages . . . ."

(Opp. at 12; Compl. ¶ 14.)  CCC reported a favorable response to this new

legislation.  For example, Plaintiffs cite a CCC April 16, 2003 press release,

which stated that, despite

---

     [6] As a part of their marketing-strategy allegations, Plaintiffs also allege that "Defendants also created the false impression that Coke was successfully introducing its new C2 beverage product." (Opp. at 12 n.9; Compl. ¶¶ 88, 91, 102, 105, 110, 111.)  In support of this allegation, Plaintiffs point to statements by Defendants that C2's introduction was "very strong," "very successful," and "benefitting" CCC's overall strategy. (See id.)  As these statements fall squarely within the proscription on puffery as a basis for fraud, the Court finds that this aspect of Plaintiffs' allegations also fails as a matter of law.

> short-term disruption caused by the implementation of a deposit
> law . . . the Coca-Cola system remains extremely well placed to
> take advantage of the move by consumers back to returnable
> packaging.  The Company is introducing several new packages and
> initiatives in the second quarter that are expected to lead to growth
> in Germany during the second half of the year.

(Compl. ¶ 54.)

On the same day, Defendant Heyer, confident that CCC had "responded

quickly," stated in a conference call with analysts:

> [W]e've seen the worst of the impact for the change in deposit
> laws in Germany.  We're confident that we're taking the necessary
> actions to see growth in Germany . . . and we have an
> infrastructure advantage in refillable returnable packaging on a go-
> forward basis.  We're quickly responding to the new environment
> and we're optimistic in our ability to turn this situation to a
> positive advantage for our system.

(Compl. ¶ 55; Opp. at 13.)

Along the same lines, in July and October 2003, CCC issued press

releases stating that CCC "remains extremely well positioned to take advantage

of the move by German consumers." (Compl. ¶ 58.)

After Defendant Isdell took the reins at CCC, however, Plaintiffs allege

that CCC "completely repudiated Defendants' positive public statements

regarding [its] German operations." (Opp. at 15.)  In September and October

2004, for example, Defendant Isdell stated that CCC was "working to resolve some significant long-standing structural issues that have limited our system's ability to effectively develop our business in the German marketplace." (Compl. ¶ 101; Opp. at 15.)  These admissions, Plaintiffs claim, reveal the false misrepresentations contained in Defendants previous glowing characterizations of its response to the changes in the German market.

Having reviewed this aspect of Plaintiffs' allegations, the Court concludes that the above statements are not actionable.  Statements that a company is "well-positioned," "well-placed," or "optimistic" about changes in market conditions have been explicitly rejected as the basis for a securities fraud claim for the same reasons advanced here. See In re Sun Healthcare Group, Inc. Sec. Litig., 181 F.Supp.2d 1283, 1292 (D.N.M. 2002).  In Sun Healthcare, for example, the plaintiffs claimed that the defendants had misrepresented its ability to respond to changes in Medicare's reimbursement formulas by announcing, shortly after the changes came into effect, that the company was "well positioned to thrive under the new [Medicare policies]," and that it had a "unique competitive advantage." Id. at 1291.  The court rejected these statements as a basis for securities fraud liability, finding that

26

they were "immaterial because they merely state 'corporate optimism' . . . and [i]t would be impossible to objectively verify such soft statements that merely convey the subjective assertions of the speaker." Id.; see also Next Century Comms., 318 F.3d at 1028-29 (collecting similar cases).

There is no principled way to distinguish the statements offered by Plaintiffs from the statements involved in In re Sun Healthcare, or the other cases discussed above. In light of the consensus view that optimism cannot be the basis for securities fraud, it is not surprising that Defendants have not directed the Court's attention to a single case that has found similar statements actionable.[7]

_____

[7]   The only arguably actionable statement alleged by Plaintiffs is Defendant Heyer's statement that there had been a "terrific recovery in our German business." (Opp. 13 n.10; Compl. ¶ 77.)   On its face, it appears to be at least an arguable statement of present condition on a matter which a reasonable investor may consider to be important to an investment decision, particularly where specific information about CCC's Germany division is not separately reported in CCC's financial statements.

Upon closer examination, however, Plaintiffs' allegation fails.  Plaintiff alleges that Defendant Heyer made this misrepresentation in a April 21, 2004 conference call with analysts.  A review of the undisputed transcript, however, reveals that Defendant Heyer stated: "In Europe, our business performance was very strong with 4% volume growth and very strong double-digit profit growth which was due to favorable pricing and mix realization, tight expensive control, a terrific recovery in our German business *profit margins* and strong equity income growth." (Ex. 21 to Defs.' Br. in Supp. of Mot. to Dismiss (emphasis added).)

By omitting the words "profit margins" without notation,  Plaintiffs' give the false impression that Defendant Heyer was referring to all of CCC's business operations in

Furthermore, for the same reasons discussed above, the Court concludes that these statements are "forward-looking" and accompanied by meaningful cautionary language.  Indeed, the court in <u>Harris</u> rejected alleged misrepresentations virtually identical to those alleged here.  <u>See</u> <u>Harris</u>, 182 F.3d at 805 ("[W]hether [defendant] is "well positioned" is a statement whose truth can only be known after seeing how [defendant's] future plays out.").

Plaintiff argues that certain statements within the conference calls and press releases were stated in the present tense and should thus not be considered forward-looking.  However, in <u>Ehlert</u>, the Eleventh circuit interpreted <u>Harris</u> to require that courts "view [a statement] as a whole [to] determine whether it is forward-looking." 245 F.3d at 1318.  Indeed, "the fact that [a statement] is a

---

Germany, when he was in fact referring to only a "terrific recovery" in *profit margins* – one financial indicator among many that Defendant Heyer might have marshaled in support of his optimistic self-evaluation of CCC's European operations.  The absence of any specific allegation that Defendants misrepresented their *profit margins* in Germany, however, is fatal to Plaintiffs' allegation.

The Court notes that the PSLRA, with its special pleading requirements and its mandate that statements by business managers be considered  in context and "as a whole," <u>see</u> <u>Ehlert</u>, 245 F.3d at 1318, places the burden on Plaintiffs to accurately represent  their alleged misrepresentations in their Complaint.   Here, Plaintiffs have employed an ill-advised tactic of selective quotation and redaction – which is itself misleading – and allocated to this Court the burden to comb through CCC's statements to check accuracy of both content and context.

present tense statement does not render in non-forward looking." Id. at 1318

n.5.  In the statements at issue, Defendants expressed that they were "confident"

and "optimistic" about their operations, that their initiatives were "expected to

lead growth," and that they had an "infrastructure advantage in returnable

refillable packaging *on a go-forward* basis," among other things.  Each of their

statements, when viewed as a whole, were concerned with evaluating CCC's

future in Germany.[8]  As such, the Court concludes that they are forward-looking

statements.

Moreover, the cautionary statements accompanying the alleged

misrepresentations are meaningful under the PSLRA.  CCC's cautionary

statement specifically addresses "changes in consumer preferences," "changes

in the non-alcoholic beverages business environment," "changes in economic

and political conditions." (See Ex. 6 to Defs.' Br. in Supp. of Mot. to Dismiss at

1.).  Furthermore, during the July 17, 2003 conference call, Defendant Heyer, in

remarking on some of the risks associates with CCC's German operations,

---

[8] To be sure, the Court does not aggregate all of the alleged statements, which were made at different times, to consider the statements *in toto.*  Instead, it reviews each statement "as a whole" at the time it was made.  See Ehlert, 245 F.3d at 1318 (viewing section of prospectus "as a whole" in determining it was forward-looking).

stated, "as we look forward, we still have some uncertainties what's going to happen with mandatory deposits, that's a critical date in October the 1st when the industry is meant to put in a centralized take back system." (See Ex. 10 to Defs' Br. in Supp. of Mot. to Dismiss at 10.)  The risks of changing market conditions, changing political environments, and specifically, the institution of a "take back system" to deal with the effect of Germany's deposit law were disclosed in connection with CCC's more optimistic forward-looking evaluation of the conditions surrounding its German business.  Having reviewed the cautionary statements accompanying Plaintiffs' alleged misrepresentations, the Court concludes that they are "meaningful" within the PSLRA.

Accordingly, because the alleged misrepresentation constitute immaterial puffery and are, in any event, forward-looking statements protected by the PSLRA safe harbor, the Court concludes that Plaintiff's allegations of misrepresentation relating to the conditions surrounding CCC's German operations fail as a matter of law.

4.      Statements Regarding Status of CCC's Bottler Relationships

In their fourth allegation, Plaintiffs allege that Defendants misrepresented that CCC "had made considerable progress . . . strengthening bottler

relationships." (See Opp. at 17-19; Compl. ¶ 50.)  Plaintiffs cite statements that

CCC was "very well aligned" with its bottlers, that CCC's "relationships with

[its] bottling partners have never been stronger," that CCC made "tremendous

improvements with [its] bottlers around the world," and that CCC was "as well

aligned with our bottlers today as at any time in [its] history." (Compl. ¶¶ 50-

55.)  Plaintiffs allege that these were false representations because CCC had in

fact been experiencing difficulties with its bottlers throughout the Class Period,

and these difficulties were acknowledged by CCC's new CEO, Defendant

Isdell, in late 2004.  Plaintiffs conclude:

> In truth, Defendants had not succeeded in aligning Coke's interests
> with its bottlers, and at no time during the Class Period was Coke's
> relationship with bottlers the best it had ever been in history.  In
> fact, Coke's operations in key markets were in disarray due to
> extremely bad relationships with bottlers, including Coke's main
> North American bottler, Coca-Cola Enterprises.

(Opp. at 19; Compl. ¶ 57.)

In effect, Plaintiffs allege that, instead of characterizing CCC's bottler

relationships as "well aligned," "strong," or "strengthening," Defendants should

have adopted a more negative tone.  For the same reasons as discussed above,

the these statements constitute immaterial puffery.  As such, the Court

31

concludes that Plaintiffs' claims fail insofar as they rely on statements

characterizing Defendants' relationships with its bottlers.

     5.    Defendants' Alleged Failure to Write Down its German
          Assets

In their final allegation, Plaintiffs allege that Defendants misstated CCC's

financial results by failing to write down the value of its German bottling assets

in 2003.  Construing their Complaint liberally, Plaintiffs allege that Defendants

fraudulently overstated the amount of CCC's value in its German assets in 2003

in violation of Generally Accepted Accounting Principles ("GAAP") when they

knew, based on changes in German law and its resultant effects on the market,

that their German assets had been impaired.

Plaintiffs correctly point out that alleged financial misstatements are not

the "soft" or subjective "puffery" that renders other statements immaterial as a

matter of law. See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir.

1996) (distinguishing between"soft" projections and forecasts from "hard"

current quarter information about material changes subject to disclosure

requirements).  As this Court has held, "violations of GAAP may constitute

false or misleading statements of material fact in violation of Rule 10b-5." In re

Scientific-Atlanta, 239 F.Supp.2d at 1363.  Furthermore, the safe harbor

provisions of the PSLRA exclude intentionally false financial misstatements.

<u>See</u> 15 U.S.C. § 78u-5(b)(2)(A) ("[T]his section shall not apply to a forward-looking statement . . . included in a financial statement prepared in accordance with generally accepted accounting principles.).  Because the Court cannot find an alleged financial misstatement immaterial as a matter of law, it proceeds to examine whether Plaintiff's final allegation is subject to dismissal under the other requirements of Rule 10b-5 and the PSLRA.

## IV.  Pleading with Particularity

### A.     Legal Standard

In addition to adding a safe harbor for forward-looking statements, the PSLRA introduced a heightened pleading requirement.  A complaint alleging securities fraud must therefore "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  Moreover, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

A violation of Generally Accepted Accounting Principles (GAAP) may support a claim for securities fraud if alleged with the requisite particularity and state of mind.  "Far from being a single-source accounting rulebook, GAAP 'encompasses the conventions, rules, and procedures that define accepted accounting principles at a particular point in time.' "  Shalala v. Guernsey Mem. Hosp., 514 U.S. 87, 101, 115 S. Ct. 1232, 131 L. Ed. 2d 106  (1995).  Because GAAP provides accountants with a wide range of discretion, GAAP violations must be pled with particularity.  See Lovelance v. Software Spectrum Inc., 78 F.3d 1015, 1021 (5th Cir. 1996) (noting that GAAP "is a term of art encompassing a wide range of acceptable procedures, such that an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement" (citations and quotations omitted)).  Accordingly, plaintiffs must plead "pertinent facts, including particular transactions as well as the underlying basis for any figures asserted by Plaintiffs, demonstrating that the specified accounting principle applies." K-Tel Int'l, Inc. Sec. Litig., 107 F.Supp.2d 994,

AO 72A
(Rev.8/82)

999-1000 (D. Minn. 2000).   Bald allegations that "statements in one report should have been made in earlier reports do not make out a claim of securities fraud." Id. (citing Stevelman v. Alias Research, 174 F.3d 79, 94 (2d Cir. 1999). With these principles in mind, the Court turns to address the Plaintiffs' remaining allegation.

**B.    Plaintiff's Allegation of Failure to Properly Account for Impaired Assets**

Plaintiffs' final allegation concerns Defendants' timing in writing down the value of intangibles in its bottler franchises in Germany. (See Compl. ¶¶ 121-134.)  According to Plaintiffs, in 2002, CCC took control of Coca-Cola Erfrischungsgetraenke AG ("CCEAG"), its largest bottler in Germany, in order to consolidate its German operations.  As a requirement to its acquisition, CCC consolidated its financial statements with CCEAG.  To account for its newly acquired franchise assets in its financial statements, CCC reported $576 million in "Bottler Franchise Rights" in an early-2002 SEC disclosure, which purportedly represented the fair value of its rights to sell CCC products in Germany at the time.

In late 2002, Germany announced, effective January 1, 2003, the enactment of a mandatory deposit law on non-returnable packages for carbonated soft drinks.  Plaintiffs assert that this "was a very significant negative development for Coke" because it restricted CCC's traditional manner of distribution *vis-a-vis* disposable cans.  (Compl. ¶ 126.)  Plaintiffs further allege:

> Coke knew these changes posed a terrible threat to its business.
> For most supermarkets, the burden of dealing with returned
> "empties" is disproportionate to the money they make from selling
> the drinks in the first place.  Because there was no nationwide
> system for returning the cans, consumers had no choice but to take
> them back to the store where they bought them – not convenient
> under the best circumstances.  As a result, many consumers
> stopped buying cans – Coke's principal dispenser – at all.  Coke,
> which had just completed a major switch to emphasize non-
> returnables, did not have the capacity to quickly switch back to
> returnables, *i.e.*, refillables.  In 6/03, Coca-Cola actually ran out of
> refillable bottles.

(Compl. ¶ 127.)

Citing a March 2003 <u>Financial Times</u> article, Plaintiffs allege that CCC's German sales declined 10% in the first quarter of 2003 as a result of the German response to the new legislation.  Thus, Plaintiffs allege, based on its knowledge of declining sales in Germany and the difficulties CCC encountered

36

AO 72A
(Rev.8/82)

in responding to market changes, CCC should have written down its $576

million good will in its German bottler franchise rights in early-2003.  Instead,

CCC "[b]elatedly, in the [third quarter of 2004], recorded a $392 million charge

to reflect the impaired value of intangible assets – primarily the bottler franchise

rights attributable to CCEAG." (Compl. ¶ 132.)  Plaintiffs argue that

Defendants, by waiting over a year before it recognized an impairment, violated

Financial Accounting Standard No. 144 and committed securities fraud.[9]  See

RESEARCH AND DEV. ARRANGEMENTS, Statement of Fin. Accounting Standards

No. 144 (Fin. Accounting Standards Bd. 2001) (available at

http://fasb.org/pdf/fas144.pdf) [hereinafter "FAS 144"].

In response, Defendants argue that FAS 144 did not allow CCC to

recognize an impairment prior to September 2004, and that, in any event,

Plaintiffs have failed to sufficiently allege with particularity a violation of FAS

---

[9] Plaintiffs also allege in their Complaint that Defendants violated various other broad GAAP provisions.  (See Compl. ¶ 133.)  For example, Plaintiffs allege that Defendants violated principles requiring disclosure of "information that is useful," "information about the economic resources of an enterprise," and "how management of an enterprise has discharged its stewardship responsibility." (Compl. ¶ 133.)  However, because the parties limit their discussion to FAS 144 in their briefs, and both parties agree that FAS 144 controls the disclosure at issue here, the Court focuses its discussion accordingly.  See K-Tel Int'l, Inc. Sec. Litig., 107 F.Supp.2d at 999-1000 (requiring particular allegations of GAAP violations).

144.  Defendants argue that FAS 144 only required CCC to test its assets for "recoverability" following the change of circumstances in Germany. Defendants claim that CCC conducted these tests in the four quarters of 2003 and in the first two quarters of 2004, and concluded that a recognition of impaired assets was not allowed by FAS 144.  In support of their assertion, Defendants point to their SEC disclosures in these time periods.  In CCC's 3rd Quarter 2003 10-Q, for example, CCC stated:

> Germany's operating results have been impacted by what our Company believes is a short-term disruption caused by the implementation of a deposit law on non-returnable packages.  The change in the law on January 1, 2003, and subsequent developments resulted in major retailers delisting non-returnable packages.
>     Furthermore, consumers have begun to shift their consumption back to returnable packages and to other beverage categories that were not impacted by the deposit law.
>     In the first nine months of 2003, the Company evaluated the impact that these events could have on our future business results and the carrying value of our investments and assets in these regions of the world.  Currently, management believes these investments will only have a temporary unfavorable impact on our operations and therefore, no asset impairment has resulted.
>
> . . . .
>
> We plan to closely monitor the above matters and other condition to evaluate any impact they might have on our assets and

> investments. We will re-assess these items in the fourth quarter of 2003.

(Ex. 15 to Br. in Support of Defs.' Mot. to Dismiss [55] at 36.)  CCC's other

SEC disclosures in the relevant time period also reflect that CCC "evaluated the

impact" of the changing conditions in Germany and determined that no asset

impairment was needed. (See Ex. 9, 12, 19 to Br. in Supp. of Defs.' Mot. to

Dismiss.)

FAS 144 regulates the manner in which companies are to recognize

"impairments" of the value of long-lived assets reported in their financial

statements.  Initially, companies report on their balance sheets the fair market

value of their assets.  Changes in circumstances, however, may affect the value

of the reported asset.  FAS 144 provides the framework for recognizing a

decline in long-term asset value on a company's balance sheets.  It provides in

pertinent part:

> A long-lived asset (asset group) shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable.
>
> . . .
>
> For purposes of this Statement, *impairment* is the condition that exists when the carrying amount of a long-lived asset (asset group)

exceeds its fair value. An impairment loss shall be recognized only
if the carrying amount of a long-lived asset (asset group) is not
recoverable and exceeds its fair value. The carrying amount of a
long-lived asset (asset group) is not recoverable if it exceeds the
sum of the undiscounted cash flows expected to result from the use
and eventual disposition of the asset (asset group). That assessment
shall be based on the carrying amount of the asset (asset group) at
the date it is tested for recoverability, whether in use (paragraph
19) or under development (paragraph 20). An impairment loss
shall be measured as the amount by which the carrying amount of a
long-lived asset (asset group) exceeds its fair value.

See FAS 144 ¶¶ 7-8.

Thus, when changed circumstances affect the value of an asset, FAS

requires a company to test whether it needs to account for an impairment in

value.  The test requires the company to determine whether the current value

reported on the books (the "book value" or "carrying value") exceeds the total

amount of undiscounted future cash flows expected to result from the use and

eventual disposition of the asset (the "undiscounted future value" or

"recoverability").  If the book value exceeds the undiscounted future value, then

an impairment must be recognized by accounting for the difference between the

book value and the asset's present fair value.  If the current value does not

exceed the undiscounted future value, however – even if there is a great

disparity between book value and present fair value – no impairment can be

recognized.   Thus, quite significantly, in the initial determination of whether to write down an asset, the book value of the asset is not considered against its present fair value, but rather against a potentially much greater sum – the total undiscounted value of future cash flows.[10]   As Judge Panell has explained:

> The impairment review under [now FAS 144] hinges upon a calculation of estimated future cash flows, which is subject to a bright line rule.  If the future cash flows to be generated by the asset exceed its carrying value (or book value), then [a company] may not write-down the asset at all.  If estimated future cash flows are less than the asset's book value, then [the company] must

---

[10] FAS 144, by virtue of its impairment test, appears to grant much latitude in the determination of whether to recognize an impairment.  As explained above, FAS 144 does not require a company to recognize an impairment solely if the fair value of an asset has declined, even if the decline is substantial; rather, it must do so only when "recoverability" has been jeopardized.  The test for recoverability, which weighs an asset's carrying value against future *undiscounted* revenues, provides ample cushioning, if for no other reason, by not requiring managers to discount to present value the estimate of future cash flows.  The extra cushioning provided by FAS 144 would appear to not only allow, but require, carrying values to remain constant during significant fluctuations in market conditions which are considered by managers in their reasonable judgment to be temporary.  Thus, even if market conditions adversely affect the asset's fair value, but a fair estimation indicates that its carrying value is "recoverable" from undiscounted future revenues, an impairment charge is forbidden.

Notably, once a company recognizes an impairment based on negative market conditions, it is not allowed to go back and "restore" the asset if favorable market conditions cause value to increase. See FAS 144 ¶ B53.  Thus, the cushion provided by FAS 144 in recognizing the reduction in value of an asset is balanced against the prohibition on recognizing increases in fair value.

Furthermore, FAS 144 recognizes that, because its application is based on estimates of uncertain future events, business judgment must be used. See FAS ¶ B43 ("Because precise information about those assets . . . seldom will be available, judgments, estimates, and projections will be required . . . .").

41

write-down the asset's full fair value on its balance sheet and
recognize a corresponding charge on its operating results.  The key
aspect . . . is that the operative comparison is between the book
value and future cash flows, not between the book value and "fair
value" or market value.

In re Serologicals Sec. Litig., No. 1:00-CV-1025-CAP, slip op. at 29 (N.D. Ga.

Feb. 20, 2003) (Pannell, J.).

In support of their contention that Plaintiffs have failed to state a claim on

the basis of a FAS 144 violation, Defendants rely on Judge Pannel's decision in

Serologicals.  The court in Serologicals dismissed a securities fraud claim

premised on a failure to timely recognize an impairment of assets because the

plaintiffs did not plead with particularity a violation of former FAS 121.  Id. at

31.  In November 1999, the defendant stated in a financial disclosure that,

because of "negative market conditions," it had conducted a test for impairment

under then-FAS 121 (now FAS 144) of its goodwill value in its non-specialty

antibody business.  It determined that a write-down was unnecessary because its

estimation of undiscounted future cash flows generated by the antibody

business exceeded the book value.  See id. at 6, 21.  However, six months later,

the defendant announced an approximately $25-million-dollar impairment

AO 72A
(Rev.8/82)

charge, a reduction of over 50% of its previous value.[11]  Plaintiffs claimed that

Serologicals' statement in November 1999 that no impairment was needed,

which came just months before its recognition of a substantial impairment in

April 2000, was an intentional misrepresentation.[12]

In dismissing the plaintiffs' claims, Judge Panell reasoned that the

plaintiffs had not sufficiently pled a violation of then-FAS 121 because, though

it was undisputed that the defendants had conducted the requisite impairment

test, the plaintiffs had failed to allege that the results of the test were reported

fraudulently.  Judge Panell explained:

> The plaintiffs' chief contention appears to be that the assets
> must have been impaired in 1999 due to the negative market
> conditions that Serologicals disclosed in 1999.  The plaintiffs do
> not allege that the defendants failed to perform the requisite FAS
> 121 impairment review in the third quarter of 1999, or that the
> defendants incorrectly estimated the future undiscounted cash

---

[11] The decision indicates that the Plaintiffs alleged that, before impairment, the book value of the asset in Serologicals overstated its fair value by 225%.  Serologicals, supra at 13.  The amount of impairment was approximately $25 million. Id.  Therefore, prior to impairment, the book value of the asset in Serologicals was approximately $45 million, which, when reduced by $25 million, is 225% over the remainder of $20 million.

[12] In support of their allegations of scienter, the plaintiffs in Serologicals also alleged that Serologicals had reached an agreement to sell its business in May 2000, and therefore, it became necessary to accurately report the impairment of which they were aware all along. Serologicals, supra at 12.

flows to be produced by the assets during that prior review.  The
plaintiffs' failure to allege the specifics of what the defendants
knew and when they knew it is fatal to the instant complaint . . . .

[T]he court does not find a single allegation related to the
defendants' estimation of the future cash flows of the non-specialty
business, despite the fact that the entire FAS 121 review hinged
upon that calculation.  Instead, the calculations referenced in the
complaint are focused on what the defendants should have done.
The plaintiffs have not pled with particularity facts indicating that
the defendants' review of the recoverability or failure to recognize
an impairment in 1999 did not comply with FAS 121.  Nor do the
plaintiffs allege that the defendants misrepresented the results of
the 1999 impairment review.  Moreover, the plaintiffs do not allege
that the factors and conditions affecting an estimation of the future
cash flows of the non-specialty assets in 1999 were identical to
those affecting such an estimation in 2000.  Thus, the court finds
that the plaintiffs fail to allege with any particularity facts to
suggest that the non-specialty assets were impaired at the times
that the defendants said the were not or, more importantly, that
they should have known they were so impaired.

Id. at 22.

Plaintiffs, however, in arguing that their allegation is pleaded with

sufficient particularity, cite Carpenters Health & Welfare Fund v. The Coca-

Cola Co., No.1:00-CV-2838-WBH (N.D. Ga. Aug. 20, 2002) (Hunt, J.), in

which Judge Hunt refused to dismiss an action alleging that the defendants had

deliberately concealed problems caused by the deteriorating value of its

investments in Russia and India. Id. at 42.  The plaintiffs there alleged that the

44

defendants violated then-FAS 121 by failing to write down the value of their

Russian and Indian assets in 1999.  The court concluded that plaintiffs'

"numerous allegations regarding Coke's Russian bottling assets and Coke's

Indian bottling assets that SFAS guidelines required to be written down" were

sufficiently particular.  Id. at 35.  The court in Carpenters Health did not,

however, indicate whether the defendants had in fact conducted the impairment

test required by then-FAS 121 during the period in which the plaintiffs claimed

the defendants should have recognized an impairment.

Having reviewed these materials, the Court concludes that the Complaint

does not plead with sufficient particularity Plaintiffs' allegation that Defendants

violated FAS 144 such that it constitutes securities fraud.  In reaching this

conclusion, the Court is guided by the well-reasoned opinion by Judge Pannell

in Serologicals, and finds Carpenters Health distinguishable on its facts.

In attempting to distinguish Serologicals, Plaintiffs state that unlike here,

"the asset impairment claim in Serologicals was based on the mere existence of

the subsequent write-down without details as to why those defendants needed to

make the write-down earlier." (Opp. at 27 n.19.)  However, a close read of

Serologicals reveals that the allegations in that case were even more

particularized than Plaintiffs' allegations here.  For example, it appears that in Serologicals, the plaintiffs alleged that defendants should have more cautiously estimated their undiscounted future revenues and offered their own calculations under then-FAS 121.  These estimates, they alleged, would have required the defendant to recognize an impairment charge.  See Serologicals, supra at 31 n.5. What is more, in Serologicals, the defendants had admitted to the SEC that they had incorrectly reported their operating results for the first three quarters of 1999 –  the same period in which plaintiffs alleged fraud had occurred with respect to Defendants' failure to recognize an impairment charge.  Even in light of these additional factual allegations, the court dismissed the plaintiffs' claims.

Here, besides broadly alleging that the conditions in Germany were such that Defendants knew the value of their German franchise rights had declined, and besides pointing in hindsight to a impairment charge taken in 2004, Plaintiffs do not allege that the FAS 144 tests conducted by CCC in 2003 and the first-half of 2004 were either fraudulent in and of themselves, or fraudulently reported in CCC's financial disclosures.  Moreover, "the plaintiffs do not allege that the factors and conditions affecting an estimation of the future cash flows of the [German] assets [in 2003] were identical to those affecting

46

such an estimation in [2004]." <u>Id.</u> at 22.  There is no principled way to distinguish the allegations in <u>Serologicals</u> from the allegations made here. Accordingly, the Court concludes that Plaintiffs' have failed to adequately allege with particularity their claim for securities fraud.

## V.   Other Matters

The Court concludes that Plaintiffs' Complaint fails to state a claim for relief under § 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder. Plaintiff's claim under § 20(a), which is dependent upon a violation of Rule 10b-5, therefore fails. 15 U.S.C. § 78t(a).

Because the Court concludes that Plaintiffs have failed to allege any actionable misrepresentations of material fact, the Court need not address the other issued presented in this case.  Accordingly, the Court does not express an opinion on whether Plaintiffs' Complaint adequately pleads scienter with specificity or whether the Plaintiffs' Complaint adequately pleads loss causation under the standard set forth in <u>Dura Pharm, Inc. v. Broudo</u>, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).

**VI.    Plaintiffs' Request for Leave to File Amended Complaint**

Plaintiffs request leave to file a third amended complaint.  Under

Fed.R.Civ.P. 15(a), "leave shall be freely given when justice so requires."  In

deciding whether to grant leave the court should consider several factors,

including (1) undue delay, (2) bad faith, (3) the possible futility of an

amendment, and (4) undue prejudice that an opposing party would suffer as a

result of the amendment, and (5) a party's repeated failure to cure deficiencies

in amendments previously allowed." See Foman v. Davis, 371 U.S. 178, 182,

83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).

The Court is not yet convinced that granting leave in this case would be

appropriate.  On May 9, 2005, Plaintiffs filed their initial Complaint, which

consisted of 12 pages.  After consolidation, and after Defendants sought

dismissal of that initial complaint, Plaintiffs filed their First Amended

Complaint, which spans 137 pages and which is at issue here.  This Court has

determined Plaintiffs' First Amended Complaint is patently defective.  In view

of this failing, the Court questions whether additional amendments by Plaintiffs

would be futile.  Nevertheless, the Court recognizes the standard under Rule 15

is liberal.  Should Plaintiffs desire to further amend their Complaint, they

AO 72A
(Rev.8/82)

should file a motion for leave to amend which includes their proposed Second

Amended Complaint and a brief addressing the propriety of amendment under

Rule 15(a) not later than 20 days after the entry of this Order.  Responses

should be filed within the time limits set forth in the  Local Rules of this Court.

See LR 7.1, NDGa.

## VII.  Rule 11 Sanctions

The PSLRA expressly requires courts to make Rule 11 findings upon the

final adjudication of a federal securities fraud action.  The relevant provision

states:

> (1) Mandatory review by court
> In any private action arising under this subchapter, upon final
> adjudication of the action, the court shall include in the record
> specific findings regarding compliance by each party and each
> attorney representing any party with each requirement of Rule
> 11(b) of the Federal Rules of Civil Procedure as to any complaint,
> responsive pleading, or dispositive motion.
>
> (2) Mandatory sanctions
> If the court makes a finding under paragraph (1) that a party or
> attorney violated any requirement of Rule 11(b) of the Federal
> Rules of Civil Procedure as to any complaint, responsive pleading,
> or dispositive motion, the court shall impose sanctions on such
> party or attorney in accordance with Rule 11 of the Federal Rules
> of Civil Procedure. Prior to making a finding that any party or
> attorney has violated Rule 11 of the Federal Rules of Civil

Procedure, the court shall give such party or attorney notice and an opportunity to respond.

15 U.S.C. § 77z-1 (1998).  See also Ehlert, 245 F.3d at 1320 (reversing district court for failing to make necessary Rule 11 findings after dismissing complaint).

In the event that the Court declines to grant Plaintiffs leave to amend their Complaint, the Court must address whether the parties have fully complied with Rule 11.  Should Plaintiffs choose to seek leave to amend their Complaint, the Court will reserve this issue for briefing until after the Court rules on the motion for leave to amend.  Should Plaintiffs decline to seek leave to amend, Plaintiffs are directed to file a brief addressing the issue of Rule 11 sanctions within 20 days of the entry of this Order.  Responses, if any, should be filed within the time limits set forth in the Local Rules of this Court.

## Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss [55] is hereby **GRANTED**.  Should Plaintiffs desire to amend their Complaint, they are hereby **DIRECTED** to file a motion for leave to amend which includes their

AO 72A
(Rev.8/82)

proposed Second-Amended Complaint and brief in support not later than 20 days from the entry of this order.  Any response and reply should be filed in accordance with the Local Rules of this Court.  Should Plaintiffs decline to seek leave to amend, Plaintiffs are hereby **DIRECTED** to file a brief addressing the issue of Rule 11 sanctions not later than 20 days from the entry of this Order.  Responses, if any, should be filed within the time limits set forth in the Local Rules of this Court.

**SO ORDERED** this   29th   day of September, 2006.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

51